IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SYED RAZA,<br><br>   Plaintiff,<br><br>v.<br><br>ACCENTURE LLP,<br><br>   Defendant. | Case No.: 1:25-cv-3999<br><br>**Trial by Jury Demanded** |

## COMPLAINT

Plaintiff, SYED RAZA, by and through his attorneys, CASE + SEDEY, LLC, for his Complaint at Law against Defendant and states and alleges as follows:

### Introduction

1. This Action arises after Defendant Accenture terminated Plaintiff because of his gender and in retaliation for lodging internal complaints about discrimination. Plaintiff files this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., as amended ("Title VII"), the Illinois Human Rights Act, 775 ILCS § 5/1-101 et seq. ("IHRA") and the Family & Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq., as amended ("FMLA").

### The Parties

2. Plaintiff Syed Raza ("Plaintiff") is a citizen of the United States and a resident of Orland Park, Cook County, Illinois. Plaintiff was at all relevant times employed by Defendant Accenture and was an "employee" as defined by the aforementioned statutes.

3. Defendant Accenture LLP ("Defendant") is a limited liability partnership with its United States Headquarters in Chicago, Cook County, Illinois. At all relevant times, Defendant had more than fifty employees and was an "employer" as defined by the aforementioned statutes.

4. Jurisdiction is conferred on this Court by the above-named statutes, as well as by 28 U.S.C. § 1331. Venue of this action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391 (b) and (c).

**Factual Allegations**

5. Plaintiff began working for Defendant in May 2013 as a Senior Manager in Accenture's Applied Intelligence practice. Plaintiff joined Defendant with 20 years' experience in consulting and corporate roles, most of which was in Business Planning, AI/Analytics and technology.

6. In 2019 Plaintiff moved from the Analytics Group to the Organizational Analytics practice.

7. Plaintiff consistently received positive performance reviews and feedback. His personal sales for 2018/2019 totaled approximately $20M, and he built Defendant's Enterprise Analytics practice which tracked approximately $150M in annual sales. In his FY 21-22 performance feedback, one Managing Director, noted that Plaintiff was "…one of the best business-focused data and analytics people we have…and a great leader within our business, operating at a Managing Director ("MD") level." Plaintiff consistently received this type of positive feedback from those he worked with throughout his tenure.

8. In or around 2019, Defendant hired Julie Sweet as CEO. Soon after, Ms. Sweet announced her goal to achieve gender parity at Defendant by 2025.

9. From 2019 to 2023, Plaintiff formally submitted his case for promotion to Managing Director and was denied each year. In 2019, Plaintiff led the T&O Analytics team. In doing so, he was supported by a small delivery team in India which was led by a female manager who reported to Plaintiff. When the promotion cycle came around, Defendant denied Plaintiff a

promotion to Managing Director. Instead, Defendant promoted Plaintiff's female subordinate to Managing Director even though she had documented performance issues. Moreover, the woman who was promoted had only 10-12 years of relevant industry experience compared to Plaintiff's 25 years of experience.

10. Then, in or around July/August of 2020, Plaintiff was one of the first at Defendant to author a point of view on Organizational Strategies in managing the post-pandemic future of work. Plaintiff partnered with several practice groups to design the offering and lead client proposals. He shared this paper across Defendant globally, led client discussions and proposals in North America and Europe and trained the Firm's Managing Directors on the practices. In fact, Plaintiff's paper became the standard reference document internally at Defendant on the topic. By March 2021, Ms. Sweet and her leadership team had reviewed it and had reached out to Defendant's T & O Global Lead for training and coaching on the content. Despite that Plaintiff created the point of view, the Global Lead, who was a woman, did not choose him to provide the coaching or to lead the client offering. Instead, leadership asked two women who had not contributed to the solution development at all to lead the role. As a result, Plaintiff was never credited for this work and did not receive any sales attribution or credit for it.

11. Meanwhile, during the 2021 promotion cycle, Defendant again refused to promote Plaintiff to Managing Director.

12. In December 2021, Plaintiff began to raise his concerns with leaders about the impact Ms. Sweet's gender parity initiative was having on his career and client service. He first spoke with a senior managing director about his desire for promotion to MD. This senior managing director, who was a man, told Plaintiff that he should not expect to be promoted anytime soon because Defendant's gender parity targets required a certain number of female candidates to be

promoted to MD first. Plaintiff told this senior managing director that he felt Defendant's approach was discriminatory and that it was impacting client service. The senior managing director agreed with Plaintiff but told him there was nothing he could do.

13. The following year, Defendant again refused to promote Plaintiff. This time, in or around December 2022, Plaintiff spoke with his career advisor, who was a male senior managing director. Plaintiff's career advisor also agreed that the way Defendant was achieving its gender parity goal was discriminatory.

14. Plaintiff also lodged concerns regarding the gender parity initiative and its discriminatory impact on himself and other male employees through employee surveys in 2020-2023. These surveys were supposed to be anonymous, but Plaintiff believes that leadership knew the feedback was from him based on his earlier conversations.

15. In January 2023, Plaintiff led a key engagement at one of Defendant's larger clients. On January 27, 2023, Plaintiff learned that his sister in Mumbai had been hospitalized and was in critical condition. He first requested a leave of absence to travel to India but ultimately agreed to work remotely from India so that he could continue managing the client. His sister's condition improved, and he returned to Chicago in late April. Plaintiff successfully completed the project and received extremely positive feedback from the client.

16. In or around June 2023, Plaintiff proposed a new client service offering and practice area based on client solutions, assets and IP that he had built over several years. He offered to build and lead a practice in the areas of Strategic Workforce Planning, Future Work Transformation and Organizational Risk. Plaintiff presented his proposal to leadership on November 8. Rather than allowing Plaintiff to lead the offering he developed, Defendant gave the leadership responsibility

to a newly hired female employee. The woman who Defendant chose to lead Plaintiff's offering was far less experienced in Organizational and Strategic Workforce planning than Plaintiff.

17. Unfortunately, on August 20, 2023, Plaintiff's sister was hospitalized again. At the time, Plaintiff was the lead on another client engagement for a consumer goods client. He traveled to India to be with his family where he continued to work on the client engagement and delivered it successfully in September. On September 24, Plaintiff's sister passed away. Shortly after his sister's death, his mother fell ill, and Plaintiff took FMLA leave from October 1, 2023 to October 31, 2023 to care for her. Plaintiff returned to the US and resumed working on November 1, 2023.

18. Less than two weeks later, on November 13, Defendant terminated Plaintiff as part of an alleged "cost restructuring plan." When Plaintiff asked why he had been selected for termination, his career advisor told him that he was not certain, but most likely he was selected because he had not developed the team within the practice he was aligned with and because his time spent in India had "impacted his productivity."

19. On November 15, Plaintiff spoke with his direct manager about his termination. Plaintiff told his manager that he believed he was selected for reduction because of Defendant's gender parity goal. His manager did not deny this and, instead, shared that he too had experienced gender discrimination for the last few years before he was finally promoted to MD.

### Exhaustion of Administrative Prerequisites

20. On April 19, 2024, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission. A copy of that charge is attached as Exhibit A.

21. On March 24, 2025, Plaintiff received his Notice of Right to Sue from the EEOC. A copy of that notice is attached as Exhibit B.

### COUNT I – GENDER DISCRIMINATION
### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

22. Plaintiff incorporates paragraphs 1-21 as though set forth therein.

23. Defendant discriminated against Plaintiff based on his gender when it repeatedly denied his promotion to Managing Director and instead promoted less-qualified, less tenured females to reach Defendant's gender parity goals.

24. Defendant also discriminated against Plaintiff when it selected him for termination instead of less qualified less tenured female employees.

25. As a result, Plaintiff suffered lost wages and benefits and emotional distress damages.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant discriminated him based on his gender in violation of Title VII of the Civil Rights Act;

B. Award him all lost wages and benefits;

C. Award him compensatory and punitive damages

D. Award him reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award him any further relief that the Court may deem just and appropriate.

## COUNT II – GENDER DISCRIMINATION
## IN VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT

26. Plaintiff incorporates paragraphs 1-21 as though set forth therein.

27. Defendant discriminated against Plaintiff based on his gender when it repeatedly denied his promotion to Managing Director and instead promoted less-qualified, less tenured females to reach Defendant's gender parity goals.

28. Defendant also discriminated against Plaintiff when it selected him for terminated instead of less qualified less tenured female employees.

29. As a result, Plaintiff suffered lost wages and benefits and emotional distress damages.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant discriminated him based on his gender in violation of the Illinois Human Rights Act;

B. Award him all lost wages and benefits;

C. Award him compensatory damages;

D. Award him reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award him any further relief that the Court may deem just and appropriate.

## COUNT III – RETALIATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

30. Plaintiff incorporates paragraphs 1-21 as though set forth therein.

31. Defendant selected Plaintiff for termination in retaliation for him lodging complaints of gender discrimination.

32. As a result, Plaintiff suffered lost wages and benefits and emotional distress damages.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant retaliated against him in violation of Title VII of the Civil Rights Act;

B. Award him all lost wages and benefits;

C. Award him compensatory and punitive damages

D. Award him reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award him any further relief that the Court may deem just and appropriate.

## COUNT IV-RETALIATION

## IN VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT

33. Plaintiff incorporates paragraphs 1-21 as though set forth therein.

34. Defendant selected Plaintiff for termination in retaliation for him lodging complaints of gender discrimination.

35. As a result, Plaintiff suffered lost wages and benefits and emotional distress damages.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a finding that Defendant retaliated against him in violation of the Illinois Himan Rights Act;

B. Award him all lost wages and benefits;

C. Award him compensatory damages;

D. Award him reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award him any further relief that the Court may deem just and appropriate.

## COUNT V- RETALIATION IN VIOLATION OF THE FMLA

36. Plaintiff incorporates paragraphs 1-21 as though set forth therein.

37. Plaintiff applied for and was granted FMLA leave.

38. Defendant retaliated against Plaintiff for taking FMLA leave by terminating his employment less than two weeks after his return from leave.

39. As a result, Plaintiff has suffered lost wages and benefits and emotional distress damages.

WHEREFORE, Plaintiff respectively requests that this Court:

A. Enter a finding that Defendant retaliated against him in violation of the Family Medical Leave Act;

B. Award him all lost wages and benefits;

C. Award him liquidated damages;

D. Award him reasonable attorneys' fees and costs incurred in bringing this action; and

E. Award him any further relief that the Court may deem just and appropriate.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues herein.

Respectfully submitted,

SYED RAZA

By: /s/ *Kristin M. Case*
One of Plaintiff's Attorneys

Kristin M. Case
Kate Sedey
Case + Sedey, LLC
250 South Wacker Drive, Suite 230
Chicago, Illinois 60606
(T) (312) 920-0400
(F) (312) 920-0800
kcase@caseandsedey.com
Bar ID No. 6274676